# Bibb v. Hall and Farley.

*Action  on  a  Promissory  Note.*

| 101 | 79 |
| 101 | 102 |
| 101 | 79 |
| 103 | 129 |
| 101 | 79 |
| 114 | 432 |
| 101 | 79 |
| 126 | 183 |
| 101 | 79 |
| 128 | 196 |
| 128 | 657 |
| 101 | 79 |
| 130 | 630 |
| 101 | 79 |
| 144 | 646 |

1.  *Acts and contracts of agent as binding corporation; ratification.*—
In the ordinary dealings of construction and trading corporations, it
is often impracticable for a company to speak and act through its gov-
erning body, and when acting through agents within the scope and
purview of their chartered powers, the same intendments and impli-
cations arise, as spring out of similar actions or conduct of natural
persons ; and acts of a person assuming to represent such corporation,
and transactions with him, in the line of the business of said corpora-
tion, even though without express authority, become binding on the
corporation, if subsequently ratified by it, and such ratification may
be made expressly or by mere acquiescence, or by a failure to repu-
diate the act, knowing it to have been done.

2.  *Unauthorized transfer of notes by officer of a corporation; ratifica-
tion thereof.*—A corporation was formed for the purpose of building a
railroad, and became indebted to a bank for money borrowed to carry
on its work.  The corporation was forced to borrow money almost
from the day of its organization, and in every instance was compelled
to give collateral security ; the board of directors had, in many in-
stances, authorized the transfer of collaterals by the president for the
purpose of borrowing money ; and had even authorized the mortgaging
of its lands by its president for that purpose ; the books of the corpor-
ation were kept open at their principal office, and all transactions were
entered upon them ; and the directors knew of the large indebtedness
of the said corporation to the bank.  Without express authority from
the directors, or the stockholders, the president, as the active finan-

[Bibb v. Hall and Farley.]

cial agent of the said corporation, transferred to said bank, as collateral security for said indebtedness, a note of subscription to the capital stock of the railroad company, which had been transferred to the said construction company. Subsequent to this transfer, six of the nine directors of said corporation separately signed, but not at a meeting of the directory, a paper ratifying this transfer by the president to the bank of the said note as collateral security. *Held*, that said transfer was ratified by the corporation, and was binding.

3. *Action on a note; proper parties plaintiff.*—In an action on a promissory note, when the plaintiffs are the parties to whom payment may be legally made, and who can legally discharge the debtor or maker, suit is properly brought in their names, although the money when collected may not be for their use alone, but for the use of themselves and others, to whose use they are legally required to apply it.

4. *Formation of a corporation under the general law; legal existence can not be assailed collaterally.*—For the formation of a corporation under the general law, a substantial compliance with all the terms of the general corporation law, having reference to the character of the corporation to be formed, is a prerequisite to its organization ; but when an association of persons is found in the exercise and user of corporate franchises, under color of legal organization, their existence as a corporation can not be inquired into collaterally. The corporation exists *de facto*, and is subject to all the liabilities, duties and responsibilities of a corporation *de jure*.

5. *Estoppel by contract with a corporation.*—One who contracts with a corporation having a *de facto* existence, and the reputation of a legal corporation, in the actual exercise of corporate powers and franchises, is estopped from denying the legality of the existence of the corporation, or inquiring into the irregularities attending its formation to defeat a contract, or to avoid the liability he voluntarily and deliberately incurred ; and especially is this true as to stockholders seeking to avoid a liability to creditors of a corporation.

6. *Stockholders of a corporation; fraud as a defense to action on note for subscription.*—Where one has been induced by fraud to become a stockholder in a corporation, he may set up this fraud as a defense to an action on his note, given for the payment of the amount of his subscription.

7. *Subscription to stock; fraud therein; evidence.*—Where, in an action by the transferees of a note, given by a subscriber to the capital stock of a railroad corporation, for the amount of his subscription, the maker of the note, by special plea interposes a defense of fraud in procuring his subscription, and the failure and want of consideration for the note, it is shown by the evidence that the only condition attached to the subscription was that the railroad was to be finished between certain terminal points within a certain time, and that it was to issue to each subscriber two thirds of the amount subscribed for of its own capital stock, and one third of the amount in the capital stock of a corporation formed to build said railroad ; that the note subse-

[Bibb v. Hall and Farley.]

quently executed for the amount of the subscription contained conditions relating only to the time and manner of the completion of the road, and made no reference to stock in the company formed to build said railroad; that on the day of the execution of the note the maker accepted from the said construction company its obligation to exchange one third of its stock for a like proportion of the amount of his subscription in the railroad company, when the note sued on was paid; that at the time of the execution of the note, and the last mentioned agreement, both corporations had received their certificate of incorporation, and had performed all preliminary acts entitling them to such certificate, except the payment of 20 per cent of the capital stock; and that the maker of the note himself testified that no representations were made to him that such 20 per cent had been paid, and he did not inquire or investigate the matter, the fraud attempted to be set up as a defense is not sustained, and there is shown no failure or want of consideration for the note sued on.

8. *Repeal of general corporation laws; effect as to corporations formed thereunder.*—The repeal of a general corporation law can not be construed, in the absence of express provisions, as intended to repeal the charters of corporations formed under such law previous to its repeal, when the manifest purpose of the repealing act is to substitute a new law, extending the provisions of the old, supplying omissions, and perfecting its details, without changing its general policy, or interfering with corporations formed under it.

APPEAL from the City Court of Montgomery.

Tried before the Hon. JOHN M. CHILTON, Special Judge.

This action was brought by J. L. Hall and L. B. Farley, as trustees, against the appellant, W. C. Bibb, Jr., and counted on a promissory note, given by the defendant to the Alabama Midland Railway Company, for the amount of his subscription to the capital stock of said company. This note was subsequently, together with other collaterals, transferred to the Alabama Terminal & Improvement Company, which latter company transferred the same to the Farley National Bank, and while in the possession of said bank they were transferred to the plaintiffs. The cause was tried by the judge without the intervention of a jury, who, at the request of the parties, rendered a special finding. The facts set out in this special finding are sufficiently stated in the opinion. There was judgment for the plaintiffs, and the defendant appeals, and assigns as error the rendition of said judgment.

BRICKELL, SEMPLE & GUNTER, for appellants.— (1.)

6

The only title to the note sued on is derived from the written transfer made by the president and treasurer, who have no authority *virtute officii*, or by any shown delegation of power, to dispose of the property of the corporation ; and the pleadings of the case put the burden on the plaintiffs to show the transfer of the beneficial interest by the corporation, or a lawfully constituted agent.—Code, § 2770 ; Cook on Stock & Stockholders, § 716 ; *Spyker v. Spencer*, 8 Ala. 333 ; *Gibson v. Goldthwaite*, 7 Ala. 292–3 ; *Duke v. Markham*, 10 So. East. Rep. 1017. (2.) The Alabama Terminal & Improvement Company was never more than a *de facto* corporation. The preliminaries to a legal organization as a corporation were never complied with ; there was a positive combination and agreement that the 20 *per cent.* of the subscription required to be paid in cash, should not be paid.—Code of 1876, § 1807 ; Acts of 1882–83 p. 40 ; 1 Spelling on Corporations, §§ 35 note 1, 37, 38. (3.) The corporation being *de facto* only, the law of its existence and the rule of its conduct is necessarily that which is applicable to persons, and to corporations of its kind, at the date of the several acts called in question ; and thus, when the Code of 1876 was superseded by that of 1886, the latter would become the rule of conduct alike for corporations and natural persons. (4.) But if this be not so, and it be held that there was a *de jure* organization under the Code of 1876, still the law of 1876, under which the company existed, was expressly repealed by section 10 of the Code of 1886. One of two alternatives result from this repeal. The company was either dissolved by the repeal of its charter, or it exists under, and by virtue of, and subject to, the terms of the new law. The latter may result from a continuance unlawfully, but as a *de facto* body, after the repeal of the charter, or from a continuance under the new law, taking it as an amendment merely of the old law.— *Wilson v. Tesson*, 12 Ind. 285 ; *Wright v. Oakley*, 5 Metc. (Mass.) 406 ; *Greenwood v. Freight Co.*, 105 U. S. 12 ; 71 Miss. 527. (5.) No corporation can exist *de jure* in this country without a living, subsisting statute to "feed its vitality", and it is just as certain that the unconditional repeal of a general statute "feeding the vitality" of a number of corporations, dissolves all of them, as the repeal of a special law supporting a single corporation destroys it.

There is an absolute repeal in the latter part of section 10 of the Code of 1886. But there are two conditions to be considered. The first part of the section says, it shall not interfere with existing "rights and remedies" &c. The counsel for the plaintiffs can not take shelter under these words, and insist that their corporation had a vested "right in a rule of law." This position is sufficiently answered in authority, by Taylor on Corporations, § 497, and in reason, by contemplating the consequences of such rule. It is plain that there is no shelter under this condition. The other is, that repeals of laws and re-enactments at the same instant of the same laws modified, are regarded as mere amendments and revisions, and repeal only to the extent of repugnancy. Indeed, section 10 of the Code of 1886 only undertakes to repeal general laws not included in the Code.—Endlich on Statutes, § 201; *Fairchild v. Masonic Hall Asso.*, 71 Mo. 527; *Rhodes v. Hoernerstown B. & S. Asso.*, 82 Penn. St. Rep. 180; Green's Brice's Ultra V. 98 n;. *Tomlinson v. Jessup*, 15 Wall. 458–9; *Holyoke Co. v. Lyman*, *Ib.* 500; *Greenwood v. Freight Co.*, 105 U. S. 13; *Wright v. Oakley*, 5 Metc. (Mass.) 400–6; *Close v. Glenwood*, 107 U. S. 76; *Oregon Ry. Co. v. Oregonian Ry. Co.*, 130 U. S. 26; 1 Beach on Corp., §§ 37–8; *State v. Miller*, 86 Am. Dec. 88 n.; *State v. Mayor &c. of Jersey City*, *Ib.* 240; *Middleton v. New Jersey Coast Line R. R. Co.*, 11 C. E. Green 269; *United Hebrew Asso. v. Benshimol*, 130 Mass. 327; *Town of St. Albans v. National Car Co.*, 11 A. & E. Corp. Cases, 651; *Steamship Co. v. Joliffe*, 2 Wall. 459; *The State Bank of Indiana v. The State of Indiana*, 1 Blackf. 267; *Wilson v. Tesson*, 12 Ind. 285; Sutherland on Stat. Con., § 134; Dwarris on Stat., 676; *St. Peter's R. C. v. Germain*, 104 Ill. 440. (6.) The position that although there was no authority in the president to make the pledge to the bank, the transaction was confirmed and ratified, can not be sustained. The board of directors of a corporation can not act so as to bind the corporation except in meeting assembled.—*Peters v. Lincoln &c.*, 2 McCrary, 275; *Alta Silver M. Co. v. Alta P. M. Co.*, 21 Pac. Rep. 373; *Gashiler v. Willis*, 91 Am. Dec. 667; *Baldwin v. Campfield*, 26 Minn. 55; 1 Spelling on Corp., § 424; 1 Morawetz, § 511; *Duke v. Markham*, 10 So. East. Rep. 1017. (7.) The pleas of the defendant that he was induced by fraud to subscribe for the stock, and that there was a failure or

want of consideration for the note, are sustained by the special finding. The corporation was never in a condition to give to the maker that for which he subscribed—stock of a corporation duly and legally organized. A party who deals with a corporation and receives a consideration and tries to avoid his obligation on the immaterial point to him, that the company is improperly organized and subject to a *quo warranto*, is not allowed the plea. But when the very thing to be given for this promise is valid and legal stock, which is represented can be given, and it is well known to the promiser that it can not be done, and the circumstances which might disclose the fraud are concealed to effect the deception, there is no reason of law which forbids relief to the victim of fraud.—*Snider v. Troy*, 91 Ala. 224; *Winter v. Armstrong*, 37 Fed. Rep. 512; *Bard v. Banigan*, 26 Am. & E. Corp. Cases 155; *American Tube Works v. Boston M. Co.*, 139 Mass. 5; *Reed v. Boston M. Co.*, 141 Mass. 454; 2 Spelling on Corp., §§ 573–8. (8.) A subscriber for the capital stock, the maker of the note, can not be compelled to take stock in a corporation which has not been legally organized, and the stock of which will be worthless. He is not estopped from showing these facts. . He was never a stockholder. He merely proposed to become one in a legal corporation. His offer was made on the implied condition that valid stock would and could be issued.—*Peck v. Gurney*, Law Rep. 13 Eq. Cases 79; *Winter v. Armstrong*, 37 Fed. Rep. 512; *Toledo v. Hinsdale*, 15 N. E. Rep. 671; *Reed v. Boston M. Co.*, 5 N. E. Rep. 852; *Tube Works v. Machine Co.*, 139 Mass. 5.

TOMPKINS & TROY, *contra.*—(1.) The only question raised by the present record is, whether, upon the facts disclosed in the special finding of the trial court, the city court properly rendered judgment for the appellees.—Code of 1886, § 2745; *Betoncourt v. Eberlin*, 71 Ala. 461. (2.) The plaintiffs in the court below were shown to have such interest in the note sued on, as entitled them to maintain the present action. The law never intended to prevent parties from investing in the trustee or trustees notes in which a number of persons have a separate and distinct interest, with authority to collect and receipt for the same; and when this is done such parties are clearly authorized to maintain suits in their

own names upon such notes.—Code of 1886, §§ 1784, 1832; *Yerby v. Sexton*, 48 Ala. 311; 18 Amer. & Eng. Encyc. of Law, 661; 19 Amer. & Eng. Encyc. of Law, 552–3 n.   (3.)  What law governs as to the authority of the Ala. Terminal & Improvement Co.?   That company was organized under the law contained in the Code of 1876 as amended.—Code of 1876, §§ 1803, 1812; Acts of 1882–3, p. 5.   (4.)  That law was its charter, and its rights and powers, including the mode of conducting its business, under it were the same as they would have been had a special charter been granted to it by an act setting out the same terms and provisions contained in that general law.—1 Morawetz on Corp., § 318.   (5.) The power to pledge property is a power incident to all business corporations.—*Lehman v. Tallassee Mfg. Co.*, 64 Ala. 567; 1 Morawetz on Corp., § 349.  (6.)  The power to make this pledge is vested in the officers of the corporation or in its governing body, not in the shareholders, unless there is a statute vesting it in the latter.—1 Morawetz on Corp., § 510. (7.) The only limitation upon these general powers of directors contained in the law under which this company was formed was a prohibition against the bonded indebtedness being increased, and the execution of a mortgage except by consent of the stockholders.  Pledge and mortgage are words of very different import and meaning, and the contracts by which they are created also materially differ.—18 Amer. & Eng. Encyc. of Law, 588–92.   (8.)  The contract in question created neither a strict pledge nor mortgage, but was really a deposit of the note as collateral security. The power to sell the security in payment of the debt was not given by the contract and does not exist at law. The only power in the creditors is to collect and apply the proceeds to the payment of the debt.—18 Amer. & Eng. Encyc. of Law, *supra;* Jones on Pledges, §§ 1, 651. (9.) It has been held by the highest court in the land that the power to borrow money vested in an officer of the corporation would vest in him the power to make deposit of collateral security, while it would not authorize him to make a chattel mortgage.—*Hatch v. Coddington*, 95 U. S. 48; Jones on Corporate Bonds, § 46.   (10.) Then the A. T. & I. Co. could make a deposit of the notes in controversy as collateral security, without the consent of its stockholders, if the law under which it was incor-

porated was its charter. Conceding the right to amend
or repeal that charter, we say neither has been done.
This charter was an existing right at the time of the
adoption of the Code of 1886, and was preserved by it.—
Code of 1886, § 10. (11.) Rights and powers of a cor-
poration are usually to be determined by the law in force
when it came into being.—*Chesapeake & Ohio R. R. Co. v.
Miller*, 114 U. S. 176. (12.) And the repeal of a general
law, under which a corporation has been formed, does
not repeal its charter, nor in any manner affect the cor-
poration.—2 Morawetz on Corp., § 1110; *United &c.
Asso. v. Benshimol*, 130 Mass. 325; *Freehold M. I. Asso. v.
Brown*, 29 N. J. Eq. 121; *Donworth v. Coalbaugh*, 5 Clark
(Iowa) 300; 2 Spelling on Corp., § 1066. (13.) The
rule is, that no later legislation will be held to either
repeal or amend a charter, unless it does so expressly or
by necessary implication.—*Freehold &c. Asso. v. Brown*,
29 N. J. Eq. 122; *Banger &c. R. Co. v. Smith*, 47 Me.
34; *Webb v. Ridgeley*, 38 Md. 364. (14.) Title 1, Part 2
of the Code of 1886 is not a codification of the former
provisions of the law relative to the formation of cor-
porations, but the substitution of a new system. It is
expressly declared in many places that particular pro-
visions of the new law apply to corporations organized
under former laws.—Code of 1886, §§ 1528, 1535, 1538–9,
1586–7, 1594–5. It then being shown that the legisla-
ture had expressly declared in some sections that the
new law shall apply to the old corporations, and has in
others omitted all such declaration, it must be presumed
that it was not intended that the latter should apply to
such companies.—*Lehman v. Robinson*, 59 Ala. 219.
(15.) The directors having the power to make the pledge,
if it was made without their authority they could ratify
it. Such ratification may be either by acquiescence, or
by the failure to disaffirm, when notice was brought to
them that the act had been done. The directors can
ratify what they could have authorized.—1 Beach on
Corp., § 195; 2 Morawetz on Corp., §§ 618, 627, 633–5;
90 N. Y. 607; 8 Amer. & Eng. Corp. Cases, p. 144; 9
Amer. & Eng. Corp. Cases, 508; 6 Amer. & Eng. Cor.
Cases, 380; 120 U. S. 256; 70 Mo. 324. (16.) The de-
fendant can not set up as a defense to the present action
the illegality in the formation of the corporations. The
illegality or irregularity of a corporation can not be

attacked collaterally.—2 Morawetz on Corp., § 769; *Kayser v. Bremen*, 16 Md. 90; *Lehman v. Warner*, 61 Ala. 455; *Cen. Ag. Asso. v. Insurance Co.*, 70 Ala. 120.   (17.) The payment of the money was not a condition precedent to the legal existence of the corporation; at most it was but a prerequisite to its right to do business. The corporation came into existence when it organized by electing a board of directors and officers.—Code of 1876, § 1806; *Sparks v. Woodstock* &c., 87 Ala. 294; 6 So. Rep. 195; 1 Morawetz on Corp., §§ 71–2; 2 Morawetz on Corp., § 742, (1st. Ed.); 1 Spelling on Corp., § 1; Cook on Stocks and Stockholders, § 172; *Pike Road v. Smith*, 30 Ala. 665; *Selma R. v. Rountree*, 7 Ala. 670; *Mitchell v. Rome R. R. Co.*, 16 Ga. 588; *Harod v. Haymes*, 32 Wis. 162; 101 Mass. 381–385.   (18). Having contracted with the Alabama Terminal & Improvement Co., the defendant in the present action is estopped from denying its existence as a corporation, since the rights of creditors have intervened.—Cook on Stocks and Stockholders, §§ 184–5; *Snider's Sons & Co. v. Troy*, 91 Ala. 224; 8 So. Rep. 658; 1 Spelling on Corp., § 43; *Lehman, Durr & Co. v. Warner*, 61 Ala. 455; *Central Asso. v. Ala. Ins. Co.*, 70 Ala. 120.

HARALSON, J.—I.   If there is a special finding of facts in the lower court, as was the case here, at the request of one of the parties, the Supreme Court must, on appeal, examine and determine whether the facts are sufficient to support the judgment.—Code, § 2743. It must find directly and affirmatively every issue in fact essential to the right of recovery, or judgment on it can not be pronounced, and it can not be aided by intendment or by reference to extrinsic facts.—*Betancourt v. Eberlin*, 71 Ala. 461; *Quillman v. Gurley*, 85 Ala. 594, 5 So. Rep. 345.

II.   Then, what are the issues of fact in this case, essential to recovery?

The note sued on was dated July 21, 1887, and reads: "I promise to pay to the Alabama Midland Railway Company, as now chartered under the general railroad laws of the State of Alabama, or any amendments that may hereafter be made either by general law or by act of the legislature, its order or assigns, five hundred dollars, at the banking house of the First National Bank of

Montgomery, Alabama, to be paid in cash on demand, at the maturity of the note; this amount being the total of my subscription to the capital stock of the Alabama Midland Railway Company. It is agreed, that said amount, to-wit, $500, matures and becomes due and payable, whenever the board of directors of said company shall decide that the Alabama Midland railroad has been finished to a point within a mile from the centre of the city of Montgomery, from one or the other of its terminal points, and that said road is of standard guage, laid with steel rail. Publication of said decision of said board of directors to be made in one of the daily papers of the city of Montgomery, Alabama, shall be final and conclusive notice to me of the same. It is hereby agreed and made part of this contract, that if the said Alabama Midland Railway Company should fail to complete the work, necessary to make this obligation binding, by the first day of October, 1890, then this instrument is null and void."

The finding shows, that "On the 7th day of May, 1887, the defendant subscribed $500 to the capital stock of the Alabama Midland Railway Company. The conditions attached to the subscription were, that the amount was to be paid when the railroad 'is built, furnished and equipped to this city, (Montgomery), from either one or the other of its terminal points, and a line is perfected to Jacksonville and Savannah, Ga. Upon the payment of the sum above stated, the Alabama Midland Railway Company shall issue to each subscriber two-thirds of the amount subscribed for of its own capital stock and one-third of the amount in the capital stock of the Alabama Terminal & Improvement Company, which last company is formed to build said railroad.'"

The finding states the fact, that the board of directors of each of said corporations had decided and advertised the facts in all respects as required by the conditions of said subscription and said note,—that said railroad had been built and equipped in the manner and within the time prescribed in said subscription and note.

III. The defendant's pleas were, in substance, that the plaintiffs are not the parties interested in the instrument sued on; that the note is not the property of the plaintiffs, but that it is the property of the Alabama Terminal & Improvement Company, a corporation under the

laws of Alabama; want and failure of consideration of
the instrument sued on; that both companies were fraud-
ulently organized, by means of false certificates of or-
ganization, and that this was concealed from defendant
and he was deceived and intentionally defrauded into
making the contract to subscribe for the stock. The
errors assigned are, that the facts found by the special
judge sustain these pleas, and do not sustain the judg-
ment rendered.

We have referred above, to the finding of the special
judge as to the compliance by the corporations with the
conditions of the subscription and note, touching the
manner and time of the completion of the railroad. No
point is made in the argument of counsel on the suffi-
ciency of the findings to sustain the judgment, on this
branch of the case.

IV. Let us refer, in the first place, to the ownership
of the note sued on by the plaintiffs. As touching the
same, the special finding ascertained, that the general
purpose of the Alabama Terminal & Improvement Com-
pany,—as shown by its declaration for incorporation,—
was to build and equip railroads and railways, under
contract for and with other parties; that the Alabama
Midland Railway Company received from numerous per-
sons, including the defendant, their notes for subscrip-
tion to its capital stock, and that these notes, afterwards,
became the property of the Alabama Terminal & Im-
provement Company; that the Farley National Bank, a
corporation organized under the national banking laws,
and located at Montgomery, Alabama, opened an account
with the Alabama Terminal & Improvement Company,
at the request of the company, by J. W. Woolfolk; that
in the course of the dealings between the bank and the
company, the latter became indebted to the bank, on ac-
count of money advanced to it, in the sum of about
$150,000; that this indebtedness arose by the discount by
the bank of the notes and drafts executed in the name of
the company by its president, Woolfolk; that the pro-
ceeds of such notes and drafts were placed by the bank
on its books to the credit of the company, and was
checked against by said Woolfolk, as president; that
some of the money checked out was applied by Woolfolk
to the payment of obligations of the Alabama Terminal
& Improvement Company, and some was applied by

him to the expense of constructing the Montgomery, Tuscaloosa & Memphis Railway; that the Alabama Terminal & Improvement Company paid back to the bank, about $18,000, leaving a balance due of about $130,000, which has never been paid; that J. W. Woolfolk, as president, on the — day of July, 1892, executed to the Farley National Bank an instrument in writing, transferring to said bank, as collateral security for a large sum then due, (and which sum has not been paid), a large number of the notes of subscription to its capital stock, and to the capital stock of the said Alabama Midland Railway Company, then owned by the Ala. Ter. & Imp. Co., including the note of defendant; that the said transfer was made subject to the rights of the Metropolitan Trust Company of New York, which then held said notes for the purposes of security under a contract with the Ala. Ter. & Imp. Co.; that in August, 1891, the Farley Nat. Bank failed, and was placed in the hands of a receiver by the Comptroller of the Currency; that while suspended, to-wit, in February, 1892, said Trust Company turned said notes over to L. B. Farley for said receiver.—its claim to said securities being released; that subsequently, the capital of the bank was made good, the receiver withdrawn, and the bank was authorized, under the national banking acts to resume business; that on the 23d of February, 1892, the board of directors of the Farley National Bank, (which had then resumed business), passed resolutions authorizing the transfer of said notes and securities to J. L. Hall and L. B. Farley, as trustees, and the same were so transferred, the same day, by H. D. Herron, the agent of the bank, thereto authorized, amounting to about $333,000; that all the indebtedness of the A. T. & I. Co., for the security of which the said transfer of said securities as collateral was made, (subject to certain credits), was transferred with the collaterals to the plaintiffs; but the sum of $30,000 of the original indebtedness (credited thereon as hereafter shown) was retained, and is still held by the Farley National Bank, while all the securities were transferred to the plaintiffs, to collect and apply to the payment of the whole indebtedness, including that portion retained by the Farley Nat. Bank, as shown by the transfer by said bank to the plaintiffs. The written transfer, attached as a part of the finding, recites, that suit has

been brought by the bank against the Ala. Ter. & Imp.
Co., upon said notes and other evidences of debt, which
suit is now pending ; and since said suit has been brought,
the said company has paid the bank, $10,000 in cash,
and has executed its three bills for the sum of $10,000
each, bearing date—February, 1892, and payable sixty
days, ninety days and four months after date, respec-
tively, which sum, amounting to $40,000, together with
$3,700.14, to which the company was entitled to as a
credit, being applied as credits to the ascertained balance
due by said company to the bank, viz., $151,008.99, left
a balance of $107,308.85, due by said company to the
bank, which balance, together with all of said notes and
securities, the board of directors of the bank transferred,
assigned and set over to the plaintiffs, as trustees, for
the purposes specified in the resolutions of transfer, and
authorized and empowered Henry D. Herron, for and in
the name of the bank, to execute a written instrument,
necessary and proper for the purpose of transferring the
said indebtedness and the said collaterals to secure the
same, to the plaintiffs, which he did. The amount of
the indebtedness did not include the $30,000, for which
the company gave its notes to the bank, as above stated.
No objection is made in the assignments of error, or in
the argument of the counsel, to the correctness and suffi-
ciency of these resolutions, and the transfer by Herron
under them, to accomplish the purposes designed, if
Woolfolk, as president, had the right to transfer said col-
laterals to the bank. The substance of this transfer has
been given above, in the findings of the special judge.
It is signed by J. W. Woolfolk, Pres't., and purports to
be made in behalf of the said A. T. & I. Co.

The judge finds, in respect to the authority of Wool-
folk to make this transfer, from an examination of the
minute books of the A. T. & I. Co., and from the evi-
dence, that the president was not authorized by the
stockholders to make said pledge, nor was it ever rati-
fied by the stockholders ; that his act was never expressly
authorized by the directors, nor was it ever expressly
confirmed by them, at a meeting of the directors. But,
as he stated, he reached the conclusion of fact from the
evidence, that if the president did not have the express
power, under the charter and by-laws of the company,
yet the directors, with knowledge of the facts, so ac-

quiesced in his act, in pledging the securities, that the corporation is now bound by his acts.

He bases this finding on the following facts: (a.) The Alabama Terminal & Improvement Company was compelled to borrow money almost from the date of its organization, and, in every instance disclosed by the evidence, was compelled to give security either personal or by depositing collaterals, and it took all they could do to persuade the people to lend it to them ; that papers were constantly coming to the bank and there was no money to meet them, and they had to call meetings of the people interested, and persuade them to make papers to raise money and meet such maturing obligations to keep the company from going to protest ; that, sometimes, such papers were signed, both, by the A. T. & I. Co. and the Alabama Midland Railway Company, but generally, by the former, and the debts were very large. (b.) At a meeting of the directors on August 8, 1891, the president was authorized to borrow money by a mortgage on certain lands of the company, the resolution reciting that it was desirable to use the lands as collateral for the purpose of raising money. At that meeting, the president mentioned to the board the fact of the company's indebtedness to the bank ; that under that resolution, the president executed mortgages to the bank on lands in Montgomery and elsewhere. Dr. Tennell, one of the directors of the A. T. & I. Co., testified to the fact of the failure of the bank, and that it resulted from the large indebtedness of the company to it, which fact was published in the papers and was generally known and talked about in Montgomery and Troy, but he did not know the facts before. (c.) No other director except Dr. Tennell was examined as a witness. (d.) A considerable portion of the money borrowed went to pay debts of the A. T. & I. Co. (e.) The books of the company were kept at Montgomery, Ala. A check book was kept, and showed on what account checks were drawn on the bank, and all transactions were posted on the books of the company, kept at the Montgomery office. On the 25th of January 1892, six of the nine directors of the A. T. & I. Co., signed a paper in which they ratified and confirmed the transfer by the president of these collaterals to the bank, which paper was signed, separately, by the directors, and not at a meeting of them. The

minutes of the several meetings of the directors were introduced in evidence, showing that, in all the instances there disclosed, in which collaterals had been deposited, the president was expressly authorized to deposit them.

The defendants insist, that, on the foregoing finding, it appears that the plaintiffs are not the owners of the note sued on, that it is not their property, but belongs to the Ala. Ter. & Imp. Co.

V. The basis of this contention is, that the transfer by Woolfolk, the president, and by the treasurer of the collaterals, including the note sued on, is their individual act, without the authority, *virtute officii*, or by any shown delegation of power to dispose of the property of the corporation. The finding is, as has been shown, that these officers were not authorized by any action of the stockholders to make said transfer, and it was never expressly authorized by the directors. If this were all, the contention would have to prevail.—*Speckle v. Spence*, 8 Ala. 264; *Gibson v. Goldthwaite*, 7 Ala. 281. But, these officers, and especially the president, were the active financial agents of the company. It was organized to carry on a business which required the raising, borrowing and expenditure of very large sums of money; the skill and energies of the company, with the assistance of all its friends, were greatly and sorely taxed to raise money with which to build the road, get along, pay the debts, and not to go to protest. It was impracticable, as is the case with every enterprise of the kind, to speak and act, always, through its governing body; and the old rule, requiring such formality,—as we said on another occasion,—in obedience to the demands of the commercial necessity, has been greatly relaxed. Corporations engaged in such enterprises, and incorporated trading companies, would be greatly embarrassed, if required to conform to such corporate action. "Hence, in the ordinary dealings of trading corporations, and within the scope and purview of their chartered powers, the same intendments and implications arise, as would spring out of similar acts or conduct of natural persons." *Tenn. R. T. Co. v. Kavanaugh*, 93 Ala. 329, 9 So. Rep. 395; *Ga. Pac. R. Co. v. Propst*, 83 Ala. 518, 3 So. Rep. 764. Morawetz lays down the principle, that a corporation has implied authority to conduct its business on liberal principals, and may generally do what an intelligent

man would do, under similar circumstances.—1 Mor.
on Corporations, § 365 ; 1 Am. & Eng. Encyc. of Law,
369. While, therefore, the officers of a corporation are
not free from all obedience to form, so as to be indepen-
dent of the governing body, and can not perform acts
which are *ultra vires*, and while there are many things
which, if they do, will not be recognized as binding on
their principals, yet, while they act in the line of the
business of their companies, without express authority,
but manifestly for their interests, it will require but
little to show the approval or ratification of the com-
panies.—2 Mor. on Corp., § 675. It is elementary, that
an act done by one, representing himself as the agent of
another, which he had no express authority from his
principal to do, may be ratified by the party for whom he
assumed to act. Ratification may be done expressly, or
by mere acquiescence, or a failure to repudiate the act,
knowing it to have been done, and as effectually by the
one, as by the other mode.—2 Kent, 616 ; Story on
Agency, §§ 239, 255, 256 ; 2 Morawetz on Corp., § 627 ;
1 Beach on Corp., § 195 ; *Lyndeborough Glass Co. v. Mass.
Glass Co.*, 111 Mass. 315 ; *Olcott v. Tioga R. R. Co*, 27
N. Y. 546 ; 17 Am. & Eng. Encyc. of Law, pp. 127, 162,
163.

Whether this corporation ratified this act of the presi-
dent, in transferring these collaterals, is one of fact.
Proof of circumstances from which the court can reason-
ably infer, that the act in question was generally known
by the stockholders, and more especially so by the direc-
tors, is *prima facie* evidence of ratification. The board
of directors had authorized the placing of collaterals by
the president to borrow money in other instances ; the
company was hard pressed and was resorting to every
known expedient to raise money to carry
on its work, and we are not permitted to doubt that every
director knew this fact ; it had authorized the mortgag-
ing of its lands, even, to place as collaterals for loans ;
they knew, for the president had informed them, of this
large indebtedness of the company to the bank ; the
books were kept open in Montgomery, and all transac-
tions were entered upon them ; the company had an ac-
count with the bank, and was borrowing largely from it ;
it had its check book, on which a memorandum of checks
drawn, and to whom was kept ; and it is not reasonable

[Bibb v. Hall and Farley.]

to suppose its transactions were not known and well understood by the directors, especially, if we presume, as we must, that they did their duty, and by as many of the stockholders as desired to know, or inquire. Besides this, six out of the nine directors ratified the act by a private paper, which, though not a ratification by the directory, is evidence of a knowledge and approval of the act, and of a determination not to disaffirm it. Who can question a legal ratification as binding, as if expressly done, after this finding of all these facts?

This is unlike the cases referred to by defendant, where acts have been done by officers, especially forbidden to be done, except in a certain manner, and according to certain formalties, in which cases, greater strictness of ratification is required, than in placing of collateral paper to borrow money in the current business of a company, like the one whose acts we are considering.—1 Beach on Corp., § 195.

The plaintiffs are parties to whom payment may be legally made, and who can legally discharge the debts, and though the money when collected may not be for their use, or theirs alone, but for other persons, or for theirs and others to whose use they are required to apply or pay it, the action is properly brought in their names.—*Yerby v. Sexton*, 48 Ala. 311; *Hirschfelder v. Mitchell*, 54 Ala. 419.

VI. But it is said, the A. T. & I. Co. was never more than a *de facto* corporation; that the preliminaries to a legal incorporation were never complied with; that there was a positive combination and agreement, that the 20 *per cent.* of the subscription required to be paid in cash, should not be paid, and in fact never was paid.

The findings of the judge on this branch of the defense were, that the A. T. & I. Co. was organized by the election of a board of directors, on the 20th day of January, 1887; that a certificate of the judge of probate of Montgomery county, Alabama (in which county its principal place of business was located) was issued on the 4th day of February, 1887, reciting the facts required to be recited by section 1807 of the Code of 1876; that in the organization of said corporation, the provisions of Art. I. Ch. 1. T. 1. Part 2 of the Code of 1876, were followed in every respect, .except that. 20 *per cent.* of the capital subscribed was never paid in; that checks

were given for the cash required to be paid on subscription of stock, and were put in custody of an officer of the company with instructions not to present them, and there was an agreement that they were not to be, and they have never been, collected.

It was further found, that the Alabama Midland Railway Company was incorporated in March, 1887, under the general incorporation laws found in the Code of 1876 as amended; but it did not pay the 20 *per cent.* required to be paid by law on organization; that it received afterwards, the notes of persons for subscriptions to its stock, which notes became the property of the A. T. & I. Co. The only irregularity in the incorporation of either of these companies, that has been suggested in argument, is the non-payment in cash of this 20 *per cent* of the subscription, required by law as one of the conditions to organization.

It must be admitted, that a substantial compliance with all the terms of a general incorporation law is a prerequisite to the formation of a corporation under it —1. Morawetz on Corp., § 27 *et seq.*; 1 Spelling, §§ 37-8; *Cen. Agr. & Mech. Asso. v. Ala. G. L. Ins. Co.*, 70 Ala. 120. But, as was well said in the case last cited, "When an association of persons is found in the exercise and user of corporate franchises, under color of legal organization, their existence as a corporation can not be enquired into collaterally. In a direct proceeding by the government they may be ousted. * * * * The corporation exists *de facto*,—is subject to all the liabilities, duties and responsibilities of a corporation *de jure*. It would produce only disorder and confusion, embarrass and endanger the rights and interests of all dealing with the association, if the legality of its existence could be drawn in question, in every suit to which it was a party, or in which rights were involved, springing out of its corporate existence. No judgment could be rendered which would settle the question finally. But, when the government intervenes by an appropriate proceeding, the judgment is final and conclusive, putting an end to all controversy."—*The State ex rel Sanche v. Webb,* 97 Ala. 111; *Lehman v. Warren,* 61 Ala. 455; *Frost v. Frostburg Coal Co.,* 24 Howard, (U. S ) 279, 284; *County of Macon v. Shores,* 97 U. S. 277; *Casey v. Galli,* 94 U. S. 673; *Appleton M. F. Ins. Co. v. Jesser,* 5 Allen (Mass.) 446;

4 Am. & Eng. Encyc. of Law, p. 198; Taylor on Corp., § 145; 1 Spelling on Corp., § 43; 2 Morawetz on Corp., § 1022; 1 Morawetz on Corp., § 331.

Another principle equally well settled and recognized, as may be stated in the language of this court in the *Cen. Agr. & Mec. Asso. Case, supra,* is, "Whoever contracts with a corporation, having a *de facto* existence, the reputation of a legal corporation, in the actual exercise of corporate powers and franchises, is estopped from denying the legality of the existence of the corporation, or inquiring into irregularities attending its formation, to defeat the contract, or to avoid the liability he has voluntarily and deliberately incurred. The principle is especially applicable to stockholders, seeking to avoid a liability to creditors of the corporation. Their own acts vitalized the corporation, gave it credit, invited and induced dealings with it, and it is true conservatism and sound policy, promotive of right and equity, to seal their lips against contradiction and denial of that which they must be taken to have affirmed, to the injury of strangers who must have trusted the affirmation."—*Snider's Son's & Co. v. Troy,* 91 Ala. 224, 8 So. Rep. 658, and authorities *supra.*

The payment of this 20 *per cent.* as one of the statutory prerequisites to the organization of these companies, can not be availed of as a defense to this action.—*Selma & Tenn. R. R. Co. v. Rountree,* 7 Ala. 670; *Smith v. Tallassee Br. Plank Road Co.,* 30 *Ala.* 650; *Sparks v. Woodstock I. & S. Co.,* 87 Ala. 294, 6 So. Rep. 195; 2 Morawetz on Corp., § 742.

VII. On the question of fraud and the consequent failure and want of consideration, as set up in the pleas of defendant, the judge, in addition to what has been already stated, finds, that the allegations are not sustained, on these additional grounds: That on the 7th May, 1887, the defendant subscribed for $500 of the capital stock of the Ala. Mid. Railway Co., the conditions attached to which subscriptions were, as has been above recited; that on July 21, 1887, he executed the note sued on, which contains no reference to stock in the A. T. & I Co.; the subscription contained a stipulation for one-third of his stock in the Alabama Midland Railway Company, to be substituted by an equal amount in the A. T. & I. Co.; that the condition of the note relates only to the time

and manner of the completion of the road, which were fully complied with ; that on the same day he gave the note, he accepted from the A. T. & I. Co. its obligation to exchange one-third of its stock for a like proportion of the $500 in stock of the Ala. Mid. Railway Co., when the note here sued on was paid ; that when the note was given, both companies had received certificates of incorporation, such as are provided by law, and had performed all acts entitling them to certificates, except the payment of 20 *per cent.* required by law ; and that defendant testified in the case, that no representation was made to him that the 20-*per cent.* had been paid, and he did not enquire or investigate. If one has been induced by fraud to become a stockholder in a corporation, it is true he may set up this fraud as a defense to an action on his stock notes," (2 Mor. § 769 ; 1 Mor., § 94) ; but, the findings are satisfactory to show, that the fraud complained of is not sustained.

VIII. There remains another defense, which is, that although so far as this case is concerned, if the corporations are held to be even *de jure* organizations, under the law of 1876, still, that law was expressly repealed by section 10 of the Code of 1886, and that one or two alternatives resulted, necessarily, from this repeal, namely, that the companies were either dissolved by the repeal of their charters, or, they exist under and by virtue of, and subject to, the new law. And, if they were not dissolved, but continued to exist, under the new and not under the old law, then section 1664 of the Code of 1886 became a part of their corporate life, subject to which they had, necessarily, to exist. That section, among other things, provided that a corporation, when duly organized, has power to borrow money, and to mortgage or otherwise convey or pledge its property, real or personal, but it has no power to make such mortgage, conveyance or pledge, otherwise than by the consent of the holders of the larger part in value of the capital stock, expressed by vote, at a meeting of the stockholders, called for that purpose ; and inasmuch as the pledge of these collaterals by Woolfolk, as president, to the bank, was not made in conformity to that section, it is *ultra vires* and void.

Generally speaking, the rights of a corporation are determined by the law in force when it came into being,

[Bibb v. Hall and Farley.]

though it can not be denied, that by the laws of this State, the charter of either of these companies was subject to amendment or repeal by future legislation.—Art. XIV, § 10 Const. of Ala.; *Chesapeake & Ohio R. R. Co. v. Miller*, 114 U. S. 189

Whether or not an enactment of the legislature shall operate as a repeal or alteration of a charter, where the power is reserved to alter or repeal, is a question of legislative intent. Repeals by implication are not favored, and it has been held, and we think properly, that the repeal of a general incorporation act, and the re-enactment of a new one, does not affect existing corporations formed under the former act; and the object of such legislation would seem, more reasonably and fairly to be, to make provision for future corporations only. The later act will not be held to repeal the former one, unless there is an express intention to do so, or a necessary implication to that effect, arising from the enactment.—2 *Spelling on Corp.*, § 1066; 2 Morawetz on Corp., § 1110; *Freehold Mut. Loan Asso. v. Brown*, 29 N. J. Eq. 121; *United Hebrew Benevolent Asso. v. Benshimol*, 130 Mass. 325; *Donworth v. Coolbaugh*, 5 Clarke (Iowa) 300.

That it was not the intention of the legislature to repeal the general incorporation law of 1876, as to corporations formed under it, but to enact a new law, extending the provisions of the old, perfecting it in many of its details and supplying some of its omissions, without any purpose to interfere with corporations formed under the former, is manifest from some of the new provisions of this new system, as we find them in the Code of 1886.

Section 1528 provides, that any banking corporation or loan association, *which has been* or may be organized under any law of this State, may be organized and do business under the provisions of this chapter, upon complying with the conditions following—setting them out. Of course, the necessary implication is, that the charter, under the former law still exists, and it may continue under the old, with an option to reorganize under the new, upon complying with certain conditions. Section 1535 provides, that an insurance company, when organized under the new system, *"and any such company heretofore organized,"* shall have the power conferred by that section. So, sections 1535 and 1539 extend their provisions to insurance companies,—the first, to those

"*now organized,* \* \* or which may be hereafter organized under this chapter," the latter, to "a corporation organized under this chapter, or *any insurance corporation heretofore organized under the laws of this State.*" And sections 1586, 1587, 1594, and 1595,—the two former being old sections and the two latter being new,—each makes provision for railroad companies organized under former laws. In these several sections we have a clear manifestation of the legislative recognition of the existence of former corporations, chartered under previous general law. We conclude, therefore, that without reference to section 10 of the Code, and whether the corporation law of 1876 was repealed or not by that section, the charters of corporations formed under that law were not repealed, but were left by the new law as they were previously organized.

In Massachusetts, a corporation was organized under general statutes enacted for the purpose. Later these general statutes were repealed by the legislature, which later repealing statute substantially re-enacted the provisions af the old law, so far as it related to the creation of such corporations. The question having arisen, whether the charter of the corporation, formed under the repealed statute was also repealed and destroyed by the repeal, the court said : "It is contended that as the statute of 1874 contained no reservation, it operated to destroy all corporations created under the provisions of the general statutes. \* \* But it is plain that the statute of 1874 was not passed for the purpose of affecting the rights of corporations already organized. The repeal of a general corporation law can not be construed, in the absence of express provisions, as intended to repeal the charters of corporations formed under it, especially when the manifest purpose of the repealing act is to substitute a new law, extending the provisions of the old, and perfecting its details, but not changing its general policy."

We think the old system was repealed in the enactment of the new, and no corporations may now be organized under the provisions of the Code of 1876 ; but that, as for all companies incorporated under the old law, they are continued of force under the provisions of that system.

IX. It is argued once more, that the findings show that the note sued on was pledged for all the alleged

[Bibb v. Hall and Farley.]

debt then existing; that $30,000 of this debt is held and owned by the Farley National Bank, while the plaintiffs own the remainder, and all the collaterals have been transferred to the plaintiffs; that the debt and the collaterals placed to secure it, have thus parted company, and section 1784 of the Code which provides, that a transfer or assignment of collateral security pledged to secure the payment of a debt, not accompanied by a transfer of the debt, is a discharge of the pledge, restoring the right and title of the person from whom received.

This argument proceeds on a mistake as to the finding. As appears from the findings, the amount of the debt assigned to the plaintiffs was $107,308.85. It was originally—as shown by the resolution of assignment by the bank to plaintiffs, (made a part of the findings)— $151,008.99, on which were credits of $10,000 cash, paid by the company, $30,000, the three notes given by the company to the bank—the $30,000 to which defendant is referring as the basis of this objection—and $3,700.14, together, making $43,700.14 of credits, on the original debt of $151,008.99, which being deducted, leaves $107,308.85, the balance of said original debt, which was transferred to, and is held by plaintiffs, for which all of said securities were transferred to them, to collect and pay, as well as the said sums of the three notes for $30,-000, which the bank holds.

But the original debt, for which the securities were pledged, and the securities have not parted company. That debt and the securities are, together, in the hands of the plaintiffs, as shown by the findings. If a question might be raised, whether any of the proceeds of the collections of those collaterals can be applied towards the payment of these three notes now held by the bank, it will be one between the A. T. & I. Co., the party for whose benefit the provision in the section of the Code referred to applies, and the plaintiffs, and does not arise in this case between defendant and them.

When he pays his note to the plaintiffs, he will have a full discharge,—the only point, on this branch of the case, in which he is interested.

The judgment of the court below is affirmed.